## Appeal of Miners' National Bank of Pottsville.

1. The Act of April 17th 1843 (prohibiting preferences in assignments), applies to an assignment whereby a part of the assignor's property is assigned, to be divided amongst certain creditors named pro ratâ, there being other creditors but not sufficient property remaining to pay them.

2. Such an assignment enures to the benefit of all the creditors: Per Brewster, J.

3. That the assignor had no intention to prefer any creditor is immaterial: *Id.*

February 7th 1868. Before THOMPSON, C. J., STRONG, AGNEW and SHARSWOOD, JJ. READ, J., at Nisi Prius.

Appeal from the decree of the Court of Common Pleas of *Philadelphia.*

The facts of this case are stated in the opinion of the court below, which was as follows:—

BREWSTER, J.—" This estate comes before us upon exceptions to the auditor's report.

" On the 31st day of August 1860, Charles Miller and wife, in consideration of $1, conveyed twenty-one items of property to Messrs. William Miller and Morris Patterson, in trust, to sell the same at their discretion, and after deducting from the proceeds the necessary expenses, to apply the balance 'to the payment and satisfaction in full of the debts due and owing by the said Charles Miller to his following named creditors,' then follow the names of twenty-four creditors, 'and any surplus to pay over to the said Charles Miller; but if the net proceeds  \*  \*  \*  shall not be sufficient to pay  \*  \*  all the debts due unto the said creditors,  \*  \*  then the same to be disbursed among them pro rata.'

" The assignor was copartner in a number of firms. The trustees named in the assignment sold the property and filed their accounts. Before the auditor, to whom these accounts were referred, certain creditors not named in the assignment appeared, and two very important questions were thereupon presented for decision.

" 1. Whether this conveyance was an assignment with preferences within the prohibition of the Act of April 17th 1843; and if so, then

7 P. F. SMITH—13

[Miners' National Bank's Appeal.]

2. Whether the money in the hands of the accountants was to be distributed to the individual creditors of the assignor alone, or whether partnership-creditors were to be let in as distributees.

"The auditor being 'of opinion that the Act of 1843 did not apply to this deed of trust,' the decision of the second question became unnecessary.

"An alternative table of distribution was, however, reported.

"The views thus stated by the auditor are ably supported by him in a learned report, to which exceptions have been filed, which have been argued on both sides with great ability, and have received at our hands careful consideration. On behalf of the creditors named in the assignment, it has been urged:—

"1. That there is no preference in this assignment, because the twenty-four creditors named therein share the estate pro ratâ.

"2. That the Act of 1843 has no application to partial assignments; and

"3. That there was no intention on the part of this assignor to prefer any creditor.

"It has been stated in argument that the points thus presented have never been decided in Pennsylvania.

"Although unaided by any authority directly in point, we think there should be little difficulty in deciding this question under the law of Pennsylvania. As it stood prior to 1843, the debtor was master of the situation. As far back as 1802, the counsel for the defendants in error in Burd *v.* Smith, 4 Dallas 85, argued that the right to make voluntary assignments, and their validity when made, were expressly recognised. They cited 1 State Laws 690, and they added, 'the practice of making them in various forms is notorious, sometimes on condition of a general release to the debtor, sometimes with a classification of property, according to which the sales must be effected, and sometimes with a classification of creditors, according to which a priority of payment is to be observed. The courts of Pennsylvania have uniformly recognised and supported voluntary conveyances of these several descriptions made bonâ fide, and not colorable with a latent and fraudulent use for the debtor.'

"The reporter adds as a note: 'This was agreed to be law by the counsel on both sides, and Smith, J., during the argument, declared that it had been frequently so decided in the Supreme Court.' Accordingly, we find an assignment stipulating for a release within a specified time sustained, and the sheriff held to be a trespasser who levied his fi. fa. after some of the creditors had accepted the assignment, although before the execution of the release by any creditor: Lippincott *v.* Barker (1809), 2 Binn. 174; Pearpoint *v.* Graham (1818), 4 W. C. C. R. 232; Livingston *v.* Bell (1834), 3 Watts 198; Mechanics' Bank *v.* Gorman (1844), 8

W. & S. 304; and many other cases, still maintained the debtor's control of the property, and enabled him to dictate his own terms to his creditors. At last, in 1843, in a season of great financial embarrassment, the legislature felt that some protection was due to creditors.

" First came the resolution of January 21st 1843, Pamph. L. 367, Brightly's Dig. 60, § 1, forbidding assignments by improvement corporations without the assent of certain of their creditors. Shortly after that, April 17th 1843, the act was approved, upon the construction of which the decision in this case depends. It declares that all assignments of property which shall hereafter be made by debtors to trustees, on account of inability, at the time of the assignments, to pay their debts, to prefer one or more creditors (except for the payment of wages of labor), shall be held and construed to enure to the benefit of all the creditors, &c.: Brightly's Dig. 60, § 2.

" The first case in which this act appears to have been reviewed, was Blakey's Appeal (1848), 7 Barr 449, which decided that judgments confessed were not prohibited by the statute, ' although an assignment was intended and shortly after executed.'

" Coulter, J. (at p. 451), says: ' The Act of 1843 provides, that all assignments in trust for the benefit of creditors, thereafter to be made, which prefer one or more creditors, shall be construed to enure for the benefit of all in proportion to their demands.'

" In Lea's Appeal (1848), 9 Barr 504, the old right to stipulate for a release was again maintained, and held not to work a preference under the Act of 1843.

" Within a few months after the announcement of this decision, and before the volume in which it is now reported was issued, the legislature again interposed, and declared that any conditions for the payment of the creditors only who shall execute a release, shall be taken as a preference, and be void: Act of April 16th 1849, § 4, Pamph. L. 664, Brightly's Dig. 60, §§ 1, 3.

" Now, it matters not that it has been decided that these Acts do not prohibit a composition with creditors, to wit, a contract to discharge the debtor on his absolute transfer of certain property, for this is but payment without the form of trust or trustee: Wiener v. Davis (1852), 6 Harris 331; Uhler v. Maulfair (1854), 11 Id. 481.

" Nor is it at all decisive of this case, that a chose in action may be assigned in payment of a particular debt, as in Mellon's Appeal (1855), 1 Grant 213, for this is again an actual liquidation of the debt, which can be as well effected by delivery of a bill receivable as by a bank bill.

" Still less bearing have the cases in which it is ruled that an assignment can be made of partnership property for the payment of partnership debts: Appeal of Baker *et al.* (1853), 9 Harris

76; Hubler *v.* Waterman (1859), 9 Casey 414; York County Bank *v.* Carter (1861), 2 Wright 446. For they only declare that the assignments there passed upon made the very distribution of the property which the law would have marshalled without them. This classification of the decisions relied on to support this assignment now under consideration, disposes of all the authorities cited in the argument, save those referring to papers which were in no just application of the word assignments. Thus, in Ridgway *v.* Stewart (1842), 4 W. & S. 383, it was held that the mortgage executed by the Germantown and Norristown Railroad Co. was not invalid, because it had not been recorded under the Assignment Act of 1818 within thirty days. So too in Chaffees *v.* Risk (1855), 12 Harris 432; Henderson's Appeal (1858), 7 Casey 502; and the Pennsylvania Bank Case of Griffin *v.* Rogers (1861), 2 Wright 382, the same principle was applied to documents clearly not assignments.

"The paper before us for construction is conceded to be an assignment. The Act of 1843 applies to assignments,

"1st. Of property in trust;

"2d. Made by debtors to trustees;

"3d. On account of inability at the time of the assignment to pay the debts of the assignor; and

"4th. Containing a preference of one or more creditors except for the payment of wages of labor.

"As in Lucas *v.* The Sunbury and Erie Railroad Co. (1859), 8 Casey 464, we have here property, a trustee, a trust and creditors of an insolvent who are to take under it.

"This assignment conveyed property, and it was made by a debtor to trustees. It most certainly gave the twenty-four creditors named therein a precedence as to the property assigned, and if so, they were preferred. Indeed, it is difficult to understand how they can argue that they are not preferred in the assignment, when their very claim before the court is to have priority over all other creditors by reason of what is written in the paper. The precedence and priority they claim are the very definitions by Worcester of the word preference. The verb prefer is derived from *præ* and *fero*, to bear before, and in this assignment these twenty-four creditors are named and borne before all others.

"How is this answered?

"1. It is denied that this assignment of property, which realized $64,995, is a preference.

"The creditors named in the deed admit that if they prevail they will carry off the fund to the utter exclusion of other creditors, but they argue that there is no preference amongst themselves. They share the estate equally, it is said, and hence it is argued that there is no preference. The practical effect of this argument would be to allow a debtor to assign his whole estate in

[Miners' National Bank's Appeal.]

trust for two preferred creditors, if he only adopted the precaution of stipulating that they should share the property equally. If I should announce this as the correct interpretation of the Act of 1843, I should but invite a speedy legislative correction of my error.

"In the next place it is urged that the act only applies to general assignments, and that as this is confessedly but a transfer of part of the debtor's property, the preference must be allowed to stand.

"The act lends no countenance to this argument. It does not say all 'general assignments,' but all assignments; which expression of course includes partial as well as general assignments. Applying the practical test again to this argument, it would allow a complete evasion of the law by the merest device, for the debtor could in all cases retain a dollar from the assigned estate, and thus making a partial assignment, he could create preferences without stint.

"A sufficient answer, however, to this position is found in the definition of an assignment given by Lowrie, J., in Wiener v. Davis, already cited. He says, since the Act of 1843, an assignment may be defined to be a transfer by a debtor of the whole or part of his effects to some person in trust to pay all his creditors in like proportions, &c.

"And it must also be borne in mind that it was ruled in Englebert v. Blanjot (1836), 2 Wh. 240, that a partial assignment must be recorded though the creditors preferred were less than the whole number, and that this has been followed by the decisions in Flanagan v. Wetherill (1839), 5 Wh. 280, and Lucas v. Sunbury and Erie Railroad (1859).

"Lastly, it is said that there was no intention on the part of the assignor to prefer any of his creditors.

"Suppose this was so, and that he unintentionally violated the statute, would his mere purpose to obey the law absolve his act from the consequence of the transgression? If this was an indictable offence, and he on trial in a criminal court, the question of intention might be all important, but here we deal with the act.

"No one can believe that the lease executed by the Philadelphia and Sunbury Railroad Company, in the case reported in 8 Casey 458, was intended by the officers of that corporation as an assignment, and yet it was so declared.

"The same document came up again before the Supreme Court for construction in Bittenbender v. Sunbury and Erie Railroad Co. (1861), 4 Wright 273, and the counsel argued there as here that there was no inability to pay debts. 'There was evidence of indebtedness,' he said, 'but none of insolvency.' In the elaborate opinion of Woodward, J., he says, 'We think an assignment, though not intended, was in fact made.'

[Miners' National Bank's Appeal.]

" 'This was a grant,' he continues, 'not to Bittenbender & Fisk, but to the company for their use and benefit. It was an express trust; we can make nothing else of it. But the preferences are void because forbidden by statute. The law forbids preferences in such assignments.'

"I do not deem it necessary to discuss the question as to the assignor's solvency at the date of the execution of this paper. Before the auditor the creditors contended that the assignment was made on account of inability of the assignor at the time to pay his debts, and this does not appear to have been questioned in the succeeding paragraph reporting the opposite argument. But all doubt upon this question, if it really has a place in the cause, is settled by the cross-examination of the assignor at the foot of page 28, wherein he admits that he had been in very considerable pecuniary embarrassment before making the deed of August 30th 1860. He adds that his paper had laid over and been protested in large amounts. He says further, 'I think one suit had actually been brought against me; in my opinion, if my creditors had been left to pursue their own remedies, at that time, my estate would not have been adequate to pay them.'

"It is difficult to conceive, short of absolute bankruptcy, of a clearer case of inability to pay debts. Embarrassment, protests, a suit, and a partial assignment to twenty-four creditors, are but the natural succession of events in such a history.

"I have thus endeavored to review the law and the facts as presented by this record. I feel that I have done so at unnecessary length, but my purpose has been to give every element of this case its due consideration. The result is, that the exceptions to the report must be sustained. Since the argument, the remaining exceptions have been withdrawn, and I have not noticed them in this opinion. My brethren concur in my conclusion.

"Exceptions sustained."

From this decree the Miners' Bank appealed, and filed the following assignments of error.

That the court erred:—

1. In sustaining the exceptions to the report of the auditor.

2. In not confirming the auditor's report.

3. In awarding distribution according to the alternative schedule of distribution, and not according to the distribution reported by the auditor.

4. In deciding that the assignment was an assignment with preferences within the prohibition of the Act of 1843.

*Junkin, E. Shippen, J. A. Clay* and *R. R. Smith,* for appellants, cited Blakey's Appeal, 7 Barr 449; Chaffees *v.* Risk, 12 Harris 432; Lea's Appeal, 9 Barr 504; Lucas *v.* Sunbury and Erie Railroad Co., 8 Casey 458; Bittenbender *v.* Same, 4 Wright

269; Hubler *v.* Waterman, 9 Casey 414; Houseal & Smith's Appeal, 9 Wright 484; Heckman *v.* Messinger, 13 Id. 465; Bank *v.* Carter, 2 Id. 446; Wiener *v.* Davis, 6 Harris 331.

*Samuel Wetherill* for M. A. Stall; *Fallon & Serrill* for S. & W. Welsh, and *A. V. Parsons* for Adm'rs. of Thomas Spencer, appellees, cited some of the above cases, and also Re Wilson, 4 Barr 448; Thomas *v.* Jenks, 5 Rawle 221; Hennessy *v.* Bank, 6 W. & S. 300; Seal *v.* Duffy, 4 Barr 274; During's Appeal, 1 Harris 234; Mitchel *v.* Stiles, Id. 306; Summer's Appeal, 4 Id. 174; Law *v.* Mills, 6 Id. 186; Jefferis' Appeal, 9 Casey 40.

The opinion of the court was delivered, February 7th 1868, by

AGNEW, J.—So long as men manage their own affairs, and preserve the control of their property, it has been the policy of our laws to suffer them to deal with their estates, in the absence of fraud, as they find most conducive to their interests. They may, therefore, convey or deliver property in satisfaction of debts, compromise liabilities, prefer creditors by mortgage or judgment, and even secure a class of creditors by a judgment to a trustee for their use: Chaffees *v.* Risk, 12 Harris 432; York Co. Bank *v.* Carter, 2 Wright 446; Blakey's Appeal, 7 Barr 449; Guy *v.* McIlree, 2 Casey 92; Wiener *v.* Davis, 6 Harris 331. This results in absence of bankrupt laws, from that freedom of individual action which the genius of our institutions secures and concedes, as a measure of liberty belonging to the citizen, and necessary to the development of the greatest good of society. It supposes that while the debtor preserves the control of his affairs in his own hands, the vigilance of creditors will be competent to protect their interests and to avert any injury. But when compelled by embarrassments he is obliged to part with that control, by placing his affairs in the hands of others, and thereby putting his property out of the reach of his creditors, experience teaches that restraint becomes necessary. When a man can no longer go on in business, and what he has must pass into the liquidation of his debts, fairness requires that he should not dictate the course his property shall take. To permit it, is to afford an opportunity for the enemies of virtue to obtain preference, and to create prejudicial hostility. The first efforts to correct the evil began by simple regulation. The assignment was to be recorded to prevent secret trusts. The trustees were made answerable to the courts by requiring them to give security, to render true accounts and to make proper distribution. The entire laws were revised and reduced to system in the Act of November 14th 1836. Still preferences were tolerated by express provision, and by conditions of release. This led to the Act of 17th April 1843. It is entitled " an act to prevent preferences in assignment," and it is

argued from the title that its intention was only to forbid preferences expressed in the deed itself. But this is contrary to the public sentiment which led to the proposal of the act, and to the plain intent found upon its face. It would enable the debtor always to prefer creditors simply by framing his deed to suit his purpose. He has thus only to name those he would prefer in the deed, and leave out all others; and indeed, under that construction of the law, I see nothing to prevent his multiplying his deeds, and thereby to divide his estate and graduate his preferences. All his property could be assigned for the benefit of a favored few, and they his nearest relatives. Such cannot be the meaning of the law, but its true design is, that when a debtor cannot go on in business, but finds he must stop, his property shall be administered for the benefit of all his creditors alike, on the principle, Equality is equity. The language of the act plainly points to this, the assignments it applies to being those made "*on account of inability at the time of the assignments to pay their debts,*" and made "*to prefer one or more creditors.*" If the words "on account of inability," &c., had been omitted, the laws would have had a range inconsistent with the individual freedom to dispose of property possessed by solvent debtors not likely to have been sanctioned by the general sentiment of the people. But these expressions furnish a key to unlock the intent. Inability to pay debts marks the period when business must stop, and the assignment at this time evinces the motive of the debtor to control the actions of his creditors. He knows best the state of his affairs, and when he is likely to stop; and the law intends, that on arriving at this point, he shall not anticipate the disclosure by placing his property in trust for his favorites, and beyond the reach of others. Something was meant by the expression "to prefer one or more." If all or the bulk of his effects be assigned in trust for one creditor, or for two or three, what matters it that there is no preference among these few? The preference is thus effectually given, and it is palpably against the main intent of the law to prevent debtors, on the eve of failure, from placing their property in the hands of trustees, and out of the reach of all not named in the assignment. Some importance must be also attached to the words used to give effect to the assignment, to wit, that it shall enure to the use of *all the creditors* in proportion to their respective demands. It is thought that this means all the creditors named in the deed. Had this been the legislative intent, it would have been easy to express it, and the very absence of qualifying expressions is a strong circumstance against it.

The same expression appears in the Act of 1849, passed to prevent preferences by way of conditions requiring creditors to release. The words are copied literally from the Act of 1843, without qualification, and indicate no restriction to the creditors

named in the deed.   It is thought, that however just it may be to give this offset to a general assignment of all a man's property, the law ought not to be construed so as to prevent a partial assignment for some of the creditors; and the facts of this case are appealed to in proof of the propriety of this position.   But the answer is, that the law makes no distinction in the character of the assignment, when its procuring cause is the impending failure of the debtor.   The language is, " All assignments of property in trust" made on account of inability at the time to pay their debts. Such a distinction would defeat the main purpose, and would introduce an impracticable rule.   How much property should pass by a partial assignment?   How many creditors shall be included in its benefits?   It would be impossible to answer this definitely. There is no legal standard; and what would be reasonable either as to the quantity of property or the amount of debts to be preferred, would be as fluctuating as the circumstances of each case. Former laws relative to assignments applied to both general and partial, and this act being in _pari materia_, should receive a like interpretation to preserve harmony in the system, and arrive at the probable legislative intent.   The circumstances of this assignment prove conclusively, that it was made by Charles Miller on account of his inability to meet his debts; and the large amount of property assigned, and magnitude of the interests intended to be protected by it, leave no room to doubt that this case falls within the provisions of the Act of 1843.

The main question upon the construction of the act, has not been distinctly decided so far as we know.   Expressions have been used, indicating the impression that particular judges supposed the act had reference only to preferences expressed in the assignment, as in Blakey's Appeal, 7 Barr 449, and Lea's Appeal, 9 Id. 504. But the point before us not being in the mind of the court, dicta cannot prevail over what we believe to be the true intent of the Act of 1843.

We are therefore of the opinion that the assignment made by Charles Miller enured to the benefit of all his creditors.   Concurring with the learned judge of the Common Pleas in his able opinion, we affirm his decree, and order the costs to be paid by the appellants.   The court further order and refer the account to the prothonotary of this court, for the purpose of ascertainment, adjustment and distribution of the balance, after notice to the counsel of the parties.